IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 10, 2019 Session

**MATTHEW WHITEHAIR v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. 64154     David M. Bragg, Judge**

_____

**No. M2019-00517-CCA-R3-PC**

_____

Matthew Whitehair, Petitioner, was convicted of one count of simple assault, two counts of aggravated sexual battery, two counts of sexual battery, five counts of attempted incest, one count of incest, one count of statutory rape by an authority figure, and one count of sexual battery by an authority figure. Petitioner was found not guilty of two counts of incest and two counts of statutory rape by an authority figure. His convictions were affirmed on direct appeal. *State v. Matthew Whitehair*, No. M2014-00883-CCA-R3-CD, 2016 WL 880021, at *1 (Tenn. Crim. App. Mar. 8, 2016), *perm. app. denied* (Tenn. Oct. 20, 2016). Subsequently, Petitioner filed a timely petition for post-conviction relief in which he alleged various instances of ineffective assistance of trial counsel and appellate counsel, among other things. After a lengthy, multi-day hearing, the post-conviction court denied relief. Petitioner appeals from the denial of post-conviction relief. After our review, we determine that Petitioner has failed to present clear and convincing evidence that he is entitled to relief. Consequently, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 2 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Kimberly S. Hodde, Nashville, Tennessee, for the appellant, Matthew Whitehair.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In February of 2010, Petitioner was indicted by the Rutherford County Grand Jury for three counts of rape of a child, two counts of rape, eight counts of incest, three counts of statutory rape by an authority figure, and one count of sexual battery by an authority figure. *Matthew Whitehair*, 2016 WL 880021, at *1.[1] Petitioner's adopted daughter was the victim named in the indictment.

Because the underlying facts of the case are relevant to our determination of the issues on appeal, we will summarize them here. At trial, the victim's boyfriend testified that he reported the suspected abuse to his mother and his pastor after witnessing an "odd" incident between Petitioner and the victim at the victim's home in 2009. *Id.* at *1.

According to the victim, the abuse started when she was eleven in her bedroom when she awoke to Petitioner on top of her with his "private part inside of her." *Id.* at *3. The victim described her mother as "strict" and explained that she would often ask Petitioner to talk to her mother when the victim wanted permission to do certain things. The victim testified about three separate instances where she wanted to do something, like go to a homecoming dance or open a MySpace account, and when she asked Petitioner to talk to her mother about whether she could do those things, he told the victim she knew "what [she had] to do." The victim knew that this "meant she would have to have sex with [Petitioner]." *Id.* Each of the three times she described, the victim testified that she had vaginal intercourse with Petitioner in her parent's bedroom in exchange for Petitioner talking to her mother about her requests. The victim also testified about an incident of anal intercourse in the summer between eighth and ninth grade in exchange for permission to go to the mall to meet her boyfriend. That same month, the victim testified that she had "sex with [Petitioner] so [her boyfriend] could visit" their home. Petitioner testified to another incident of vaginal intercourse during which she "counted the swirls" on a mirror on the wall. *Id.* at 4. The victim also testified to multiple incidents of oral sex including descriptions of Petitioner putting his mouth on her vagina and breasts.

The victim explained that her family fell apart because of the allegations and that she had not seen her mother in more than two years. The victim acknowledged that the

---

[1] This Court's opinion on direct appeal was designated as "Not for Citation" by the Tennessee Supreme Court pursuant to Rule 4 of the Rules of the Tennessee Supreme Court. According to Rule 4, if "an application for permission to appeal is hereafter denied by [the supreme court] with a 'Not for Citation' designation, the opinion of the intermediate appellate court has no precedential value" and may not be cited "except when the opinion is . . . relevant to a . . . post-conviction . . . action involving the same defendant."

ten different instances described in her testimony were the "only times [she] could talk about." The victim also acknowledged that she had repeatedly spoken with people about her allegations after they were reported and that she testified at a juvenile court proceeding that the first episode occurred in her parents' bedroom rather than her own bedroom. *Id.* at 5. The victim explained that she recalled additional incidents and details through counseling and admitted that her recollection of events had been inconsistent but stated "[t]hat does not mean that I'm not telling the truth." *Id.* at *6.

Kevin Smith, an investigator with the Department of Children's Services (DCS), testified that the department received a referral about the victim in October of 2009. He observed an interview with the victim, spoke with the victim's brother, and watched the interview with the victim at the Child Advocacy Center. *Id.* at *8.

Sarah Hampshire, a nurse practitioner, was certified by the trial court as an expert. She testified that she performed a pelvic exam on the victim. According to Ms. Hampshire, the victim's "totally cooperative" behavior during the exam was unusual. Ms. Hampshire noted that the victim's hymen was "completely stretched." *Id.* However, Ms. Hampshire saw no evidence of vaginal or anal trauma and concluded that the victim had been sexually active for quite some time as evidenced by her "mature vaginal vault" and the use of a medium-sized Pederson speculum for the exam.

Julie Rosof-Williams, a nurse practitioner, also examined the victim after allegations against Petitioner. Her examination of the victim took place about 48 hours after the most recent reported sexual contact. Ms. Rosof-Williams ultimately concluded that the victim had a normal exam but that this did not mean the victim had not been sexually abused. *Id.*

At the conclusion of the State's proof, the State presented the following election of offenses:

> count one, rape of a child, and count six, incest, for [Petitioner's] vaginally penetrating the victim on her bed in her bedroom when she was "near" the sixth grade and eleven years old; count two, rape of a child, and count seven, incest, for [Petitioner's] having vaginal intercourse with the victim, who was in the seventh grade and under the age of thirteen, on his bed in his bedroom when the victim asked to have a boyfriend and go to a homecoming dance; count three, rape of a child, and count eight, incest, for [Petitioner's] having vaginal intercourse with the victim, who was in the seventh grade and under the age of thirteen, on his bed in his bedroom when the victim asked to go to a Valentine's dance; count four, rape by force or coercion, and count nine, incest, for [Petitioner's] having vaginal

- 3 -

intercourse with the victim, who was in the eighth grade and under the age of fifteen, on his bed in his bedroom when the victim wanted a MySpace account; count five, rape by force or coercion, for [Petitioner's] having anal intercourse with the victim, who was under the age of fifteen, when the victim wanted to see her boyfriend before he left town and was on her menstrual cycle; count ten, incest, for [Petitioner's] sexually penetrating the victim, "possibly [on] October 9, 2009[,]" when [Petitioner] rented movies and watched them in the home with the victim's boyfriend; count eleven, incest, and count fourteen, statutory rape by an authority figure, for [Petitioner's] having anal intercourse with the victim, who was approximately in the tenth grade and fifteen years old, in October 2009 when the victim wanted to go to the mall with her boyfriend while her mother was in Africa; count twelve, incest, and count seventeen, sexual battery by an authority figure, for [Petitioner's] lifting the victim's shirt, kissing her breasts, and having oral sex with her when she was over the age of thirteen but under eighteen; count thirteen, incest, and count sixteen, statutory rape by an authority figure, for [Petitioner's] having vaginal intercourse with the victim, who was about fourteen years old and going into the ninth grade, when the victim wanted to reconcile with her boyfriend and asked [Petitioner] to talk with her mother about it; and count fifteen, statutory rape by an authority figure, for [Petitioner's] vaginally penetrating the victim, who was in the tenth grade and about fifteen years old, on October 12, 2009, in his bedroom.

*Id.* at *8.

Several witnesses, including the victim's brother, the victim's mother, and the victim's best friend, all testified for Petitioner, and characterized the victim as a liar. *Id.* at *9-11. The victim's pediatrician, who testified as an expert in pediatric medicine, testified that she never noticed any signs of sexual abuse.

Petitioner himself testified about working two jobs and raising his children. Petitioner recounted an incident between the victim and the victim's boyfriend where Petitioner walked into the living room and the victim's boyfriend was on top of the victim. *Id.* at *12. Petitioner denied all allegations.

Several rebuttal witnesses testified as to the victim's good character. At the conclusion of the eight-day trial, Petitioner was convicted of one count of simple assault, two counts of aggravated sexual battery, two counts of sexual battery, five counts of attempted incest, one count of incest, one count of statutory rape by an authority figure,

- 4 -

and one count of sexual battery by an authority figure. Petitioner was found not guilty of two counts of incest and two counts of statutory rape by an authority figure. As a result of the convictions, Petitioner was sentenced to a total effective sentence of eight years at 100% to be followed by seven years of supervised probation. Petitioner was also required to register as a sex offender and be subject to community supervision for life pursuant to Tennessee Code Annotated section 39-13-524.

Petitioner appealed his convictions. On direct appeal, Defendant argued that the evidence was insufficient to support the convictions. *Matthew Whitehair*, 2016 WL 880021, at *1. Defendant also challenged the unanimity of the verdicts, the trial court's decision to limit cross-examination of the victim pursuant to Tennessee Rule of Evidence 412, and the trial court's qualification of a nurse practitioner as an expert witness. *Id.* Additionally, Petitioner argued that the State committed prosecutorial misconduct; that defense counsel should have been permitted to review files from the Department of Children's Services; that Petitioner's aggravated sexual battery convictions should be reduced to child abuse; and that cumulative error warranted a new trial. *Id.*

This Court determined on appeal that the evidence was sufficient to support the jury verdicts. *Id.* at *16. With regard to the issue surrounding Tennessee Rule of Evidence 412, this Court concluded that the State opened the door to questioning the victim about additional acts of abuse after hinting at them on direct examination but that the issue was waived by trial counsel's failure to make an offer of proof. *Id.* at *17. This Court further determined that the trial court did not abuse its discretion by certifying Ms. Hampshire as an expert witness and that the State did not commit prosecutorial misconduct during trial. *Id.* at *21. This Court also concluded that Petitioner waived his argument that the State made an improper election with respect to count seventeen based on the failure to include it in the motion for new trial. Additionally, this Court concluded that the trial court properly reviewed the victim's file from the Department of Children's Services and determined that it did not contain any exculpatory material. Lastly, in an issue raised at oral argument, this Court determined that Petitioner was not entitled to plain error relief based on his argument that aggravated sexual battery was not a lesser-included offense of rape of a child. *Id.* at *26.

Petitioner filed a timely petition for post-conviction relief after the supreme court denied permission to appeal. In the petition, he alleged multiple instances of ineffective assistance of both trial and appellate counsel, including: (1) trial counsels' failure to secure a properly qualified medical expert and/or challenge State experts; (2) trial counsels' failure to poll the jury following the verdict at trial; (3) trial counsels' failure to challenge and preserve the issues related to Tennessee Rule of Evidence 412; (4) trial counsels' failure to call Amanda Parks as a witness at trial; (5) trial counsels' failure to object to the testimony of Kevin Smith from the Department of Children's Services; (6)

trial counsels' failure to produce character witnesses for Petitioner; (7) trial counsels' failure to object to repeated instances of prosecutorial misconduct; (8) trial counsel's failure to "candidly advise" Petitioner about his lack of criminal trial experience; (9) appellate counsel's failure to adequately argue prosecutorial misconduct on appeal; and (10) prosecutorial misconduct at trial violated Petitioner's constitutional rights.

There were several attachments to the petition for post-conviction relief. Accompanying the petition for relief was an affidavit of Dr. Brent Boles, a board certified doctor of obstetrics and gynecology. Dr. Boles expressed his disagreement with the conclusions reached and testimony offered by Ms. Hampshire at trial. Specifically, Dr. Boles took issue with Ms. Hampshire's characterization of the victim's vagina as having a "mature vaginal vault" and conclusion that the victim had been sexually active for some time based on her "apparent comfort and cooperation with the pelvic exam and the size of the speculum used." Dr. Boles determined that the testimony of Ms. Rosof-Williams was "far more clinically and medically accurate" but concluded that the victim's allegations were "not credible based upon medical evidence and are medically impossible in [his] professional opinion."

The petition was also accompanied by an affidavit of Connie Grantham, a juror at Petitioner's trial. Ms. Grantham explained that she did not think Petitioner was guilty but that the "younger women" on the jury were convinced of his guilt so she compromised by agreeing on verdicts that resulted in some reduced charges and some not guilty verdicts.

There was also a letter attached to the petition from the Tennessee Board of Professional Responsibility, noting the censure of the assistant district attorney who was responsible for prosecuting Petitioner's case.

The State filed a motion to exclude the affidavit of Ms. Grantham on the basis that the court had already ruled the affidavit inadmissible at the hearing on the motion for new trial pursuant to Tennessee Rule of Evidence 606(b). At the outset of the post-conviction hearing, the post-conviction court noted that the court had "previously ruled on that issue" in the order denying the motion for new trial and found no reason to "disturb the previous ruling," thus excluding the juror affidavit.

*Post-conviction Hearing*

Petitioner testified that he was originally charged with multiple allegations of sexual abuse regarding his adopted daughter in October of 2009. He had no prior experience in the criminal justice system and did not know any criminal defense attorneys at that time. He eventually hired trial counsel after trial counsel was "recommended to [Petitioner's] wife and [him]self through [trial counsel's] mother."

- 6 -

Petitioner explained that trial counsel's mother worked with Petitioner's wife at a local elementary school and went to church with Petitioner and his wife. Petitioner claimed that trial counsel told him that "he had handled these type of cases before" but admitted on cross-examination that he did not do any research about trial counsel's qualifications prior to hiring him and relied "strictly" on "[trial counsel's] mother's recommendation." Petitioner believed that trial counsel was qualified to take the case so Petitioner hired him. If Petitioner had known that trial counsel had never actually tried a criminal case in front of a jury, he "would have asked him to recommend [him] to a more experienced attorney who has experience with child cases." At some point, trial counsel made the recommendation that a second lawyer be retained. As a result, Petitioner hired co-counsel at trial counsel's recommendation in the summer of 2010.

As the case proceeded to trial, Petitioner was aware that the State was consulting with two expert witnesses. According to Petitioner, trial counsel did not hire a medical expert to assist in the defense. In fact, Petitioner recalled trial counsel "saying that it wasn't necessary to spend the money on an expert witness, because . . . [State expert] Ms. Rosof-Williams was neutral" and trial counsel "thought he could get whatever information he needed from her testimony." Petitioner admitted that he accepted trial counsel's judgment on this issue but explained that he was never offered the option to hire an expert. Had trial counsel asked, Petitioner would have provided funds with which to hire an expert. In fact, Petitioner had access to approximately $15,000 to $20,000 that he would have provided to trial counsel to hire an expert. Petitioner did not think that trial counsel even cross-examined Ms. Rosof-Williams at trial and was dissatisfied with trial counsel's performance in that regard. Petitioner was also dissatisfied by trial counsel's failure to offer any character witness testimony at trial. Petitioner did not recall discussing whether Ms. Parks should be called as a witness at trial.

Petitioner retained counsel for appeal and testified that he paid appellate counsel $55,000. Petitioner claimed that appellate counsel was recommended to him by an attorney in another state, not trial counsel. Petitioner testified that he did not have a conversation with trial counsel about who would represent him on appeal. Petitioner did not think he had spoken with trial counsel since the sentencing hearing but admitted that he did remember talking to trial counsel at the hearing on the motion for new trial.

Dr. Brent Boles testified as an expert in adult and pediatric gynecology. He opined that the testimony of the State's experts at trial was inaccurate and misleading. Dr. Boles expressed concern with the terminology "mature vaginal vault" espoused by State's witness Ms. Hampshire at trial to describe the victim's pelvic exam. Dr. Boles explained that he had never heard that term in his 30 years as a doctor. Dr. Boles also explained that despite Ms. Hampshire's conclusion with regard to the victim's sexual activity, a person "cannot conclude based on someone's level of comfort or discomfort

with a pelvic exam whether or not they have ever been sexually active or . . . sexually assaulted." Further, Dr. Boles disagreed that the size of a speculum used for a pelvic exam was indicative of "whether or not they have ever been vaginally penetrated" or sexually active.

Dr. Boles described the hymen as a "ring of tissue that encircles the vaginal opening." He explained that there can be a "great deal of variation" in the diameter of the opening. Ordinarily, he explained, "after sexual activity . . . [the hymen] usually will no longer be intact." Dr. Boles explained that prior to puberty, the vaginal tissue and hymen are "unestrogenized." Once puberty begins, and the tissue becomes "estrogenized, [it] becomes more soft and pliable and flexible." According to Dr. Boles, "[e]strogen in significant amounts will be present in the child's body two weeks before her first period, but not before that." Dr. Boles found it a "glaring" deficiency that the two nurse practitioners were not asked about the effect of estrogen on the hymen at trial during their testimony. Dr. Boles found it "highly improbable [that the hymen would be intact] in a person who has been subjected to numerous episodes of forced vaginal penetration, especially when those episodes allegedly began as long as a year before she goes through puberty." In his expert medical opinion, he opined that it is "practically impossible to see an intact hymen when sexual assault [allegedly] began on a regular basis a year prior to puberty."

Dr. Boles noted that Ms. Rosof-Williams performed the initial examination of the victim within 48 hours of an alleged anal rape. Dr. Boles commented that he "would expect to see redness, irritation, abrasions of the skin, possible bruising" and noted that according to Ms. Rosof-Williams, "there was none of that present." Dr. Boles explained that his expectations would not change even if the victim was compliant during the rape. In his opinion, the finding that there was no trauma to the anal area was "inconsistent with what the stated accusations were." Additionally, in his expert opinion, the description of the abuse by the victim was not consistent with the findings of the physical examination. Specifically, Dr. Boles stated that it was not "plausible" that the victim had an "intact hymen" after being "subjected to forcible vaginal penetration with an adult, male penis" on a number of different occasions. Dr. Boles also noted that the fact that there was a "lack of anal trauma 48 hours after a forced assault with no lubrication" was inconsistent with the report of abuse. In fact, Dr. Boles agreed that the allegations of abuse between the ages of eleven and fifteen were not credible given the lack of damage to the victim's hymen. He offered this medical opinion "with an absolute degree of medical certainty."

Amanda Parks, the District MAC Supervisor with Franklin Special School District, also testified at the post-conviction hearing. Prior to working with Franklin Special School District Ms. Parks worked with Murfreesboro City Schools at an

elementary as the supervisor of the before and after school program. Ms. Parks knew the victim and her family because the victim's mother was an employee of the school and both the victim and her brother attended the before and after care program at the school. She met Petitioner for the first time in 2006 when he came to the school to check on his children after a tornado. She became aware of the allegations against Petitioner in October of 2009. After the allegations were made, the victim was no longer permitted to have contact with Petitioner. Ms. Parks helped the victim's mother with the children, taking them to practice and appointments on an "as-needed" basis. Ms. Parks explained that the victim's mother did not want the victim to be "left alone" and wanted to have a "support system" for the victim. As a result of spending time with the victim, Ms. Parks heard the victim express "emotions and frustrations with some of the things she was going through." Ms. Parks was specifically concerned with comments made by and behavior of the victim on at least two occasions: one in November of 2009 and one in the spring of 2010.

In November of 2009, on the day of the preliminary hearing, Ms. Parks picked the victim up at home to drive her to a football game. The victim was "agitated and frustrated" because they asked her "the same things over and over" at court "about sex." The victim told Ms. Parks that she had "never had sex." Ms. Parks was taken "aback" by the victim's comment.

On another occasion, in the spring of 2010, Ms. Parks drove the victim to a counseling session in Nashville. When the session was over, the victim walked "right out the front doors of the building," without stopping to talk to her. When Ms. Parks got to the car, the victim was "very agitated." When Ms. Parks asked the victim if she was alright, the victim said she was annoyed because she was asked about "the same things over and over" and that it was "all about sex." Again, the victim told Ms. Parks that she had "never had sex." Ms. Parks explained that she just tried to empathize with the victim, and commented that it had to be really hard to go through everything that she was going through at the time. Ms. Parks shared the victim's comments with the victim's mother, their mutual friend Lauren Johnson, and eventually trial counsel for Petitioner. Trial counsel asked Ms. Parks to be present at trial. Ms. Parks complied, but trial counsel did not call her as a witness.

Several character witnesses testified on Petitioner's behalf. Keith Gibson testified that he had known Petitioner for "[a]t least 25 years." They worked together at Century Mold Plastics and became close friends. Mr. Gibson claimed that Petitioner had a reputation for truthfulness. Mr. Gibson was never contacted by trial counsel but stated that had trial counsel contacted him, he would have made himself available to testify on Petitioner's behalf. Likewise, Benjamin Nelson testified that he had known Petitioner for about ten years. His wife worked with Petitioner's wife in Murfreesboro. The two

families also lived in the same apartment complex and spent a lot of time together.  Mr. Nelson stated that Petitioner had a reputation for truthfulness.  Mr. Nelson confirmed that he was not contacted by trial counsel to testify at trial.

Appellate counsel testified that he started practicing law in 1974 and had handled cases in both trial court and appellate court.  Appellate counsel also testified that he was a published author of a long-standing criminal treatise and reported that he had handled "in excess of 100" appeals in his career.  Appellate counsel was not retained until after the motion for new trial was filed and ruled upon by the trial court.  Appellate counsel explained that he was unable to amend the motion for new trial and was limited by the "four corners of the motion for new trial" on appeal.  Appellate counsel reviewed the entire record and provided post-conviction counsel with the appellate record in order to assist post-conviction counsel with preparation for the post-conviction proceedings.

Appellate counsel identified the briefs, reply briefs, and other documents that he filed on Petitioner's behalf when the matter was on direct appeal.  Appellate counsel recalled reading the trial testimony of Mr. Smith that he thought was objectionable but noted that trial counsel did not object to the testimony or raise it in the motion for new trial.  Because of the posture of the issue on appeal, appellate counsel chose not to include this issue because he knew the appellate court would "not consider the merits of the issue unless it [rose] to the level of what they call plain error."  Appellate counsel explained that plain error relief was "extremely rare" and happened in "maybe even as low as 2 percent" of cases.  In other words, because the issue surrounding Mr. Smith's testimony did not meet the "criteria for the existence of plain error" appellate counsel chose not to raise it on appeal.  Similarly, there were other issues that appellate counsel did not raise on appeal because he "didn't want to pepper [his] appeal with a bunch of plain error issues, which [he] knew would never have any traction in the appellate court."  He did not want to "detract from the merits of [the] primary issues" on appeal.  For example, appellate counsel acknowledged that when he reviewed the case to determine which issues he would have raised on appeal, he noticed that there "wasn't a [jury] poll," but "never seriously" considered raising the issue on appeal.

As to the prosecutorial misconduct issue relating to family history, appellate counsel raised this issue on appeal because trial counsel "appropriately saw that as an issue and raised motions prior to trial."  Appellate counsel explained that trial counsel "vigorously" pursued this issue at trial.  Appellate counsel was of the opinion that the prosecutor's conduct "fundamentally distracted from [trial counsel's] presentation of the proof.  Appellate counsel agreed that the misconduct of the prosecutor in this case was "pervasive" but again chose not to raise every instance of prosecutorial misconduct on appeal because he did not think Petitioner would be successful when forced to raise the issue via plain error.

- 10 -

Appellate counsel explained that in his opinion, the most important issue raised on appeal was with regard to the victim's "collateral allegations" of abuse. Appellate counsel explained that in one of the bills of particulars, the victim claimed she was sexually assaulted by Petitioner on at least 50 separate occasions. Appellate counsel explained that trial counsel "tried to get into those other issues" at trial and was unsuccessful. Appellate counsel thought there were several instances of alleged abuse that "bordered on the incredible and were inconsistent with the other proof." As a result, they would have been subject to impeachment by prior witness statements, prior DCS records, medical evidence, cross-examination of the victim, etc. Appellate counsel explained,

> given the incredibleness of the 50 allegations and the fact that the alleged victim had never - - every come up with such a number before, that was a fertile ground for cross examination. And the ones that [trial counsel] very vigorously cross examined her on very aggressively were just really, really good cross examination on those that he had to work with.

> If he had had another 40 . . . , that would have been devastating. The jury may have acquitted the man.

Appellate counsel further explained that the higher the number of instances of alleged abuse, the more opportunities there would be for the victim to disclose the abuse to another person or for another person to discover the abuse. According to appellate counsel, trial counsel would have "wanted those 50 other allegations to come in." Appellate counsel explained that the trial court heard argument on the matter by both trial counsel and counsel for the State. The trial court determined that the evidence fell within the purview of Tennessee Rule of Evidence Rule 412, collateral instances of sexual behavior. Appellate counsel thought this case was different because trial counsel "was contending those other 40 [instances of abuse] never happened." In other words, appellate counsel did not think this was a Rule 412 issue but rather "garden variety cross-examination." Appellate counsel opined that trial counsel should have made an offer of proof outside the presence of the jury. Appellate counsel explained that the appellate court found trial counsel did not preserve the issue and explained that he "tried mightily to get around that" on appeal but was unsuccessful. Appellate counsel noted that this Court agreed with his argument, that the State opened the door to the additional allegations of abuse, but determined that trial counsel failed to preserve the issue by making an offer of proof, so appellate counsel was essentially precluded from proving prejudice. Appellant counsel opined that if there was a sufficient record, he may have been able to secure a reversal of Petitioner's convictions.

- 11 -

Luke Evans, a criminal defense attorney, testified as an expert on the standard of care and prevailing norms for criminal defense counsel. Mr. Evans testified that a criminal attorney should consult with the defendant with regard to retaining an expert and consult independent experts when necessary to adequately investigate a case. In this case, in particular, Mr. Evans testified that trial counsels' failure to consult or secure a defense expert fell below the range of competency. Further, Mr. Evans testified that requesting polling at the conclusion of a criminal trial was "a standard practice among criminal defense practitioners." Mr. Evans acknowledged, however, that polling the jury is a discretionary matter and that the trial judge in Petitioner's case instructed the jury on "how they [were] to deliberate and the issue of unanimity of their verdict."

Mr. Evans also testified that trial counsel should have filed a pretrial notice with regard to Rule 412 and made a written offer of proof to preserve the issue for appellate review. Mr. Evans agreed with appellate counsel that introduction of the numerous additional alleged acts was important to the defense because they made the victim's allegations less credible. Because of trial counsels' failure to get this proof in front of the jury and/or preserve the issue for appeal, Mr. Evans opined that trial counsel was ineffective. Additionally, Mr. Evans stated that trial counsel should have called Ms. Parks to testify in order to contradict the testimony of the victim at trial. Mr. Evans also opined that Mr. Smith's testimony was objectionable on several grounds, including relevancy, and that trial counsels' failure to object to Mr. Smith's testimony was ineffective. Mr. Evans also took issue with trial counsels' failure to put on character witnesses like Mr. Gibson and Mr. Nelson at trial because Petitioner's credibility was directly put at issue when Petitioner testified.

The State called trial counsel and co-counsel to testify as well as pediatric nurse practitioner Holly Gallion, an eighteen-year veteran of Our Kids Center. She was qualified by the post-conviction court as an expert in pediatric forensic evaluations for sex abuse, having personally performed over 4000 pelvic exams on children in addition to observing and peer reviewing additional exams. Ms. Gallion explained that the understanding of the hymen had changed throughout the decade preceding Petitioner's trial. Specifically, she disagreed with Dr. Boles conclusions that the victim's hymen would have been estrogenized at age 11, that there would have been notable evidence of trauma after repeated rapes, or that there would have or should have been physical findings in an exam within 48 hours of an anal rape. Ms. Gallion opined that Ms. Hampshire's testimony at trial was inaccurate, for many of the same reasons shared by Dr. Boles. Ms. Gallion also took issue with Ms. Hampshire's use of the term "mature vaginal vault" and conclusion that the victim was sexually active based on the use of a medium Pederson speculum and compliance with a pelvic exam. Ms. Gallion agreed with the conclusion that the victim's exam was normal and that data suggests that most old injuries to the hymen remain visible upon examination but that there was no visible

damage to the victim's hymen, which was intact and showed no signs of damage. Ms. Gallion testified that had she been called at trial she would have reported her disagreement with Ms. Hampshire's conclusions. Ms. Gallion explained that Our Kids Center did not diagnose sexual abuse.

Trial counsel testified that he started practicing law in 2005 and his general practice included criminal law. Trial counsel admitted that he had only tried three cases to verdict at the time of the post-conviction hearing—two criminal and one civil. Trial counsel confirmed that he met Petitioner and his wife in 2009 and admitted that Petitioner was referred to his office by trial counsel's mother. Trial counsel explained that he got to know Petitioner and his wife quickly and even gave them his cell phone number despite the fact that he made most of his clients contact him through the office. Trial counsel stated that he did not misrepresent his qualifications to Petitioner but that he probably talked about his prior experience with the assistant district attorney assigned to prosecute Petitioner's case. Further, trial counsel admitted that he had never tried a child sex case before but did not represent to Petitioner that he had done so. Trial counsel confirmed that he was paid between $30,000 and $40,000 over the course of four years pursuant to an agreement with Petitioner. Trial counsel admitted that he had no criminal jury trial experience at the time he was hired by Petitioner and could not recall if he advised Petitioner that he lacked criminal trial experience.

At some point during 2010, trial counsel contacted co-counsel about the possibility of assisting with the case. Co-counsel was more experienced and trial counsel knew that he needed help on the case. Trial counsel discussed hiring co-counsel with Petitioner and Petitioner agreed that it was a good idea.

Trial counsel explained that he spent many hours preparing for trial and interviewed somewhere between 15 and 20 witnesses prior to trial. These included people suggested by both Petitioner and his wife. Trial counsel reviewed the report from Ms. Rosof-Williams and then interviewed her in person. Trial counsel was able to question Ms. Hampshire at a juvenile court trial regarding dependency and neglect. Ms. Hampshire's trial testimony at Petitioner's criminal trial was substantially similar to the testimony she offered at the juvenile proceeding. Trial counsel downplayed the significance of Ms. Hampshire's testimony, explaining that he challenged her through a *Daubert* hearing and speculated that the jury did not give her testimony much weight. On cross-examination, trial counsel admitted that Ms. Hampshire's testimony concluding that the victim had been sexually active for some time was a problem for the defense. Trial counsel explained that he consulted with a gynecologist, who opined that Ms. Rosof-Williams's report "look[ed] good." Trial counsel explained that even though Ms. Rosof-Williams was the State's expert, he planned on utilizing her testimony at trial, even going so far as to subpoena Ms. Rosof-Williams for the defense. Trial counsel

acknowledged that he did not ask Ms. Rosof-Williams about her agreement or disagreement with Ms. Hampshire's testimony. However, trial counsel explained that he:

> questioned [Ms.] Rosof-Williams to such a degree that, in my belief, and based on the verdicts that were rendered, disqualified [Ms. Hampshire's] statements that there was this mature vaginal vault theory. If [the jury] had bought it, presumably there would have been convictions on vaginal penetration. There were none.

Trial counsel agreed that the trial court instructed the jury properly "on the process of deliberation" as well as "the requirement of unanimity" of the jury verdict. Trial counsel testified that he had no reason to believe that the jury did not follow the trial court's instructions or that the verdict was not unanimous. He explained that he did not see any reason to request a poll of the jury at the conclusion of the trial.

Regarding Rule 412, trial counsel testified that the additional 50 to 60 allegations of rape were extremely important to the defense. These allegations that allegedly occurred between the ages of 11 and 15 were disclosed by the victim during police interviews and at the preliminary hearing. Trial counsel was of the opinion that the State opened the door for all of these other instances to be included in his cross-examination and did not agree with this Court on appeal when it determined that he waived the issues for appellate review. However, trial counsel also insisted that he could not ask about specifics of the other instances in an offer of proof because it was the defense's position that they never actually happened. Trial counsel admitted that he failed to file a pretrial notice pursuant to Rule 412 and that the trial court gave him an ample opportunity to make an offer of proof but that he chose not to do so. Trial counsel admitted that he had no prior experience making an offer of proof and that he struggled with the compliance required and ordered by the trial court with regard to this issue. Trial counsel continued to insist that Rule 412 did not control the issue, but submitted a written offer of proof. Trial counsel admitted that the written offer of proof was not sufficient to preserve the issue for appeal. Trial counsel agreed that it would have helped Petitioner's case if the jury had heard about the allegations of other instances of abuse.

Trial counsel was "sure Ms. Parks [was] telling the truth." However, trial counsel explained:

> I had already elicited [proof that the victim claimed she never had sex] through Dr. Castleberry. Dr. Castleberry was a witness that we called that was [the victim's] pediatrician who had seen her, you know, for a number of years. And Dr. Castleberry had stated, hey, look, you know, I talk to the children, and note whether they say they are sexually active or not, and

whether they have had sex or not, right. That was part of her testimony. So, Dr. Castleberry had already said that after these allegations had come out -- I think it was in April of 2010 she had seen [the victim] and asked her specifically, are you having sex, have you had sex, et cetera. And she had said no. And, so, Ms. Parks -- the benefit of calling her did not outweigh the possible detriment [of Ms. Parks sharing negative things about how the family was treating the victim after the allegations].[2] And that was something that as we're closing up our proof -- and she was here. I could have called her. We could have called her. But as we did on every big decision in this case, we put our heads together, and we tried to make a decision. That was me. That was [co-counsel]. That was [Petitioner]. And most of the time, it was also [Mrs.] Whitehair. I mean, she had a say in how this was going to go. And, so, we made that call.

Trial counsel explained that he did not object to the following statement in which DCS Investigator Smith explained the process of his investigation into the accusations made by the victim in this case:

I would present my case. I would review all of my investigative tasks, to include home visits, interviews, collateral testimony, any and all other such things, background checks. That information will be presented before that team. And that is just a final check, if you will, to see if I have omitted something, if there is something else I should go and obtain, to see if the entire team, which encompasses anywhere from, oh, 30 to 50 people. It's voted on unanimously. And it was.

Trial counsel testified that he did not object to this statement because the information was not detrimental to the defense. Moreover, he had objected several times during Mr. Smith's testimony and he was trying to maintain "balance" between objecting too many times and suggesting to the jury that "you're [either] hiding something or that you're scared of evidence."

Trial counsel explained that Petitioner did not express any dissatisfaction with representation, even commenting to appellate counsel that trial counsel went "above and beyond all expectations, working tirelessly still on my behalf."

---

[2] Apparently, the victim's own mother accused her of lying about the abuse after the allegations surfaced. Trial counsel expressed reservation about calling Ms. Parks as a witness because he was concerned that the State would cross-examine her about the victim's treatment by her family.

- 15 -

Trial counsel recalled meeting with post-conviction counsel to discuss a number of issues in the post-conviction petition. However, trial counsel did not recall telling post-conviction counsel that he did not think about polling the jury or calling character witnesses on behalf of Petitioner at trial. Trial counsel conceded that even though he did not recall making these statements to post-conviction counsel, it did not mean that he did not say them.

Co-counsel testified that at the time of the post-conviction hearing he had been practicing law for 30 years. Although he had a general practice, the majority of his work was in criminal defense. Co-counsel had experience taking 30 to 40 cases to trial. Co-counsel assisted trial counsel with Petitioner's case in part because trial counsel was having difficulty with the assistant district attorney assigned to prosecute the case and co-counsel had experience in working with this particular attorney. Co-counsel described the assistant district attorney as "childish." Co-counsel actually characterized her as the defense's best witness.

Co-counsel recalled participating in an interview of State expert Ms. Rosof-Williams. Co-counsel felt like the best strategy was to "hang[ their] hat" on her lack of objective findings and explained that the defense planned to use Ms. Rosof-Williams's conclusions to discredit the testimony of Ms. Hampshire. Co-counsel did not think that he would have used an expert like Dr. Boles. He continued to believe that Ms. Rosof-Williams was the best expert for the case.

Co-counsel explained that he had never seen Rule 412 applied in this manner. Co-counsel agreed that trial counsel could have asked the victim about the additional instances of abuse but admitted that he discouraged trial counsel from doing so.

Co-counsel did not have any recollection of Ms. Parks or of her potential testimony. Co-counsel explained that his general trial philosophy was to utilize as few defense witnesses as possible. Co-counsel explained that sometimes defense counsel will not make an objection at trial because the information either does not matter or because defense counsel does not want the jury to think that the defense is fearful of the evidence. Co-counsel admitted that there were times during trial that he prompted trial counsel to object.

Co-counsel also explained that he rarely called character witnesses. Co-counsel explained that he does not handle many appeals but understands the importance of making a record and standing objections correctly to preserve issues for appeal. Co-counsel agreed that the case rested entirely on credibility.

Co-counsel acknowledged that both Ms. Gallion and Dr. Bowles disagreed with Ms. Hampshire's conclusions. However, co-counsel claimed that the defense was aware

of the errors in Ms. Hampshire's opinions prior to trial and thought that trial counsel would use these errors to emphasize the lack of credibility in her findings.

Following the post-conviction hearing, the post-conviction court denied relief in an extensive 14-page written order. In the order, the post-conviction court determined that Petitioner presented the following allegations of ineffective assistance of trial counsel: (1) trial counsel failed to properly consult and call an independent medical expert; (2) trial counsel failed to request that the trial court poll the jury; (3) trial counsel failed to adequately litigate and preserve the record on issues related to Tennessee Rule of Evidence 412; (4) trial counsel failed to call Ms. Parks to testify at trial; (5) trial counsel failed to object to the testimony of Mr. Smith; (6) trial counsel failed to present character witnesses on Petitioner's behalf; (7) trial counsel failed to "candidly advise" Petitioner about his lack of experience; and (8) trial counsel failed to object to prosecutorial misconduct during trial. The post-conviction court noted that Petitioner also alleged ineffective assistance of appellate counsel with regard to appellate counsel's failure to raise issues concerning Mr. Smith's testimony on appeal. The post-conviction court recounted the "free-standing constitutional grounds" raised by Petitioner: (1) prosecutorial misconduct; (2) failure of the trial court to poll the jury; (3) Mr. Smith's testimony; and (4) failure of the Court to provide records from the Department of Children's Services records. With respect to each of these issues, the post-conviction court fastidiously determined that Petitioner did not meet his burden to prove that he was entitled to post-conviction relief.

Now, on appeal, Petitioner argues that the post-conviction court erred in denying relief. We will examine each one of Petitioner's complaints in turn.

*Analysis*

*Post-conviction relief*

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight and value to be given to testimony, and the

factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the effective assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392-93 (Tenn. 2014). In order to sustain a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under the two prong test established by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

The test for deficient performance is whether counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688; *Henley*, 960 S.W.2d at 579. This Court must evaluate the questionable conduct from the attorney's perspective at the time, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). This Court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). However, this deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain

relief. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is a reasonable probability "sufficient to undermine confidence in the outcome" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Burns*, 6 S.W.3d at 463 (quoting *Strickland*, 466 U.S. at 694).

## I. Trial Counsel and Co-counsel

### A. Failure to Poll Jury

Petitioner argues on appeal that trial counsels' failure to poll the jury at the conclusion of the trial, both as a collective and individually, resulted in the return of a "mixed and complex verdict." Petitioner notes that trial counsel admitted the failure to poll the jury was error and contends that Petitioner was prejudiced by trial counsels' failure as evidenced by juror Grantham's affidavit. Further, Petitioner argues that the post-conviction court's determination that the affidavit of the juror was inadmissible and that trial counsel were not ineffective was error. The State, on the other hand, disagrees.

Under Tennessee law, a defendant has a constitutional right to a unanimous verdict before a conviction for a criminal offense may be imposed. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993); *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). Protection of this right often requires "special precautions [by the court] to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Id.* at 134. In Tennessee, a criminal defendant has the statutory right to have the jury polled upon request. This right is explained in Rule 31 of the Tennessee Rules of Criminal Procedure, entitled "Verdict." The rule provides for polling of a jury at the conclusion of a trial "[a]fter a verdict is returned but before the verdict is recorded" and directs the trial court "on a party's request or on the court's own initiative" to "poll the jurors individually." Tenn. R. Crim. P. 31(e). Tennessee Code Annotated section 20-9-508 also provides for polling the jury and "requires" a trial judge to "poll the jury on application of either the state or the defendant in criminal cases . . . , without exception." However, a defendant waives this right if he fails to make a timely request that the jury be polled. *State v. Banks*, 271 S.W.3d 90, 123-24 (Tenn. 2008) (citing *Rice v. State*, 475 S.W.2d 178, 180 (Tenn. Crim. App. 1971)).

It is undisputed in this case that neither trial counsel nor co-counsel requested for the jury to be polled. At the post-conviction hearing, trial counsel stated that the trial court "properly instruct[ed] the jury on the process of deliberation and the requirement of unanimity" so he had no reason to think that the jury had not followed the trial court's

- 19 -

instructions or that the jury's verdict was not unanimous. Petitioner insists that the lengthy deliberation coupled with a jury question submitted by the jury about which bill of particulars to review during deliberations indicated that the verdict was not unanimous. Citing to a case from the Wisconsin Court of Appeals, *State v. Yang*, 201 Wis 2d 725, 745-746 (Wis. Ct. App. 1006), Petitioner posits that when viewing "all of the circumstances" of Petitioner's trial, it was deficient performance for trial counsel to fail to request that the trial court poll the jury. However, this Court has held that in the absence of proof that the verdict was not unanimous trial, counsel was not deficient for choosing not to poll the jury. *See Richard Lloyd Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *33 (Tenn. Crim. App. Oct. 20, 2017), *perm. app. denied* (Tenn. Apr. 23, 2018) (noting that polling the jury is discretionary and determining the petitioner failed to show ineffective assistance of counsel where trial counsel failed to poll the jury and there was no proof that the verdict was anything but unanimous).

Here, the post-conviction court concluded that Petitioner failed to show how the failure to request a poll of the jury following the verdict was deficient representation or a violation of the constitutional right to a unanimous verdict. There is no indication that the jury verdict was not unanimous. Additionally, the post-conviction court determined that Petitioner failed to prove any prejudice resulting from the lack of jury polling. The record reflects that the trial court answered the jury question by directing the jury to review the indictment and bill of particulars, the foreperson of the jury presented the jury verdict forms to the trial court, and that all of the forms were signed by the foreperson, indicating that the jury was unanimous as to its determination on each count. The jury had to deliberate on a seventeen-count indictment, a deliberation that lasted seven hours. "The length of time that a jury deliberates has no bearing on the strength or correctness of their conclusions or the validity of their verdict. *Anglin v. State*, 533 S.W.2d 616 (Tenn. Crim. App. 1977) (citing *Williams v. Bridgeford*, 383 S.W.2d 770, 776 (1964); *Campbell v. Campbell*, 199 S.W.2d 931, 934 (1946); *Jennings v. Brown*, 3 Tenn. C.C.A. (Higgins) 113, 125 (1912)). Moreover, the trial court repeatedly instructed the jury that "their verdict had to be unanimous." A jury is "presumed to follow the instructions of the trial court." *Nesbit v. State*, 452 S.W.3d 779, 799 (Tenn. 2014). Petitioner has failed to establish that the trial court was deficient for failing to request a jury poll.

Petitioner has also failed to establish prejudice. On appeal, Petitioner insists that the affidavit of juror Grantham establishes prejudice because she indicates that had she been polled at trial, she "would not have agreed with the verdict individually, and that [she] would have said not guilty on these charges." The State claims that this issue is waived because it was not properly presented in the statement of the issues, citing Tennessee Rule of Appellate Procedure 27(a)(4) and *State v. Bishop*, 431 S.W.3d 22, 43 (Tenn. 2014). The affidavit of juror Grantham was not introduced at the post-conviction

- 20 -

hearing. It was attached to the post-conviction petition. Actually, the affidavit was ruled inadmissible by the trial court shortly after trial pursuant to Tennessee Rule of Evidence 606(b).[3] Because the affidavit was not part of the record, Petitioner failed to present any evidence of prejudice. Petitioner failed to raise the admissibility of the juror affidavit as an issue on direct appeal. To the extent Petitioner is attempting to raise this issue on post-conviction, it is waived. *See* T.C.A. § 40-30-106(g) (a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.])"; *see also Workman v. State*, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); *Rhoden v. State*, 816 S.W.2d 56, 65 (Tenn. Crim. App. 1991). Petitioner is not entitled to relief on this issue.

## B. Failure to Properly Comply With Rule 412

Petitioner's next argument is that trial counsel and co-counsel were ineffective because they failed to comply with the requirements of Tennessee Rule of Evidence 412 with regard to an offer of proof about additional allegations of rape made by the victim and thereby failed to preserve the issue for appeal. The State disagrees, noting that the post-conviction court correctly determined that Petitioner could not establish prejudice without an offer of proof as to the other alleged instances of rape. Additionally, the State contends that even if Petitioner were able to present specific instances of conduct, they would not have been admissible because they would have been "confusing to the jury."

Prior to trial, the State filed a motion in limine seeking to exclude questions and statements relating to prior sexual activity of the victim pursuant to Tennessee Rule of Evidence 412, also known as the "rape shield law." Tennessee Rule of Evidence 412 states that "in a criminal trial[ ] . . . in which a person is accused of" certain enumerated sexual offenses, "[e]vidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule" and "[i]f the sexual behavior was with the accused," the evidence pertains to "the

---

[3] Tennessee Rule of Evidence 606(b) provides that a juror may not:

testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

issue of consent[.]" Tenn. R. Evid. 412(c)(3). Rule 412 defines "sexual behavior" as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). "This broad definition deals with sexual intercourse as well as every other variety of sexual expression." *State v. Wyrick*, 62 S.W.3d 751, 770-771 (Tenn. Crim. App. 2001) (quoting *State v. Sheline*, 955 S.W.2d 42, 47 n.6 (Tenn. 1997)) (internal quotation marks omitted).

On direct appeal, this Court determined Petitioner waived this issue. The court explained that:

> During cross-examination of the victim, defense counsel asked about "the first time your father allegedly had sex with you," and the State requested a bench conference. At the bench, the prosecutor advised the trial court that she believed the appellant was about to ask the victim about the appellant's touching her on the floor of her parents' bedroom while her mother slept in the room and that defense counsel "failed to provide a 412 Motion that he intended to ask about things outside the indictment, sexual acts outside the indictment." Defense counsel responded that the State's questions on direct had suggested that the appellant was having sex with the victim many more times than was alleged in the bill of particulars and, therefore, that the State had opened the door to counsel's questioning the victim about those additional acts. The State argued that the victim had not testified outside the ten incidents alleged in the bill of particulars and requested a jury-out hearing "before anything else is brought up."
>
> The court held the hearing as requested, and defense counsel argued that he did not need to file a motion pursuant to Rule 412, Tennessee Rules of Evidence, because "[t]his all goes to credibility, and, it goes to explain what her testimony has already been." The State maintained that Rule 412 applied. The trial court stated that it wanted a written offer of proof from defense counsel regarding the instances of conduct he wanted to question the victim about and recessed for lunch. After the lunch break, defense counsel advised the court that he "did provide an offer of proof as quickly as [he] could." Upon reviewing the written proffer, the court stated as follows:
>
>> [M]ost of this offer of proof concerns prior inconsistent statements and not allegations of specific sexual conduct by the defendant, which is what Rule 412 seeks to avoid. So, I think my preference would be to have [the victim] take the stand, allow the defense to ask her those questions, and then make a determination whether or not Rule

- 22 -

412 would apply and whether or not the proof should be admissible under the exceptions to 412.

The victim returned to the stand, and defense counsel questioned her about the incident on her parents' bedroom floor.

At the conclusion of her hearing testimony, the trial court told defense counsel to "go ahead and you ask her the questions that you want to ask her concerning other specific acts so that I can make a determination whether or not I'm going to allow you to ask her those on cross-examination [pursuant to Rule 412]." Defense counsel then questioned the victim about the incidents alleged in the bill of particulars and the appellant's spitting on his hand for lubrication. Eventually, the trial court interrupted defense counsel, and the following colloquy occurred:

> THE COURT: All right. We've been going for about 35 minutes, and so far, there's only been one incident of specific sexual activity other than that that's previously been testified to . . . , and that was the activity that allegedly occurred on the floor in [her] mother's bedroom. . . . The rest of these questions are questions on prior inconsistent statements related to the testimony that she's given here at trial.
>
> . . . .
>
> I don't have any problem with you asking about prior inconsistent statements. . . . Is there something in this offer of proof that relates to a specific activity outside of that first time on the floor in the mother's bedroom that you wanted to get into?
>
> [Defense counsel]: Yes, Your Honor. If I might, I will ask her isn't it true that she stated, previous testimony, that these things happened multiple times, approximately once per month, over the, each—over her 6th grade year, her 7th grade year, and her 8th grade year, and that will get you 12 instances right there.

The State responded, "I would object to that. . . . [T]hat's not specific instances of [conduct]." The trial court stated that "[w]e're not

- 23 -

going to go any farther with it today" and ordered that defense counsel prepare for the State "exactly what it is that you plan to put before [the victim] . . . and . . . specific allegations of specific conduct you're going to ask her to testify to."

The next morning, the trial court stated for the record that defense counsel had filed a motion "on Rule 412 and Offer of Proof." In the motion, defense counsel "move[d] the Court to offer evidence of a specific instance of the alleged victim's sexual behavior. To wit, the alleged victim first alleges that she engaged in sexual behavior with [Petitioner] in the sixth grade prior to Count 1 of the Indictment." The motion further provided that after [Petitioner's] arrest, the victim told her mother at the police department that her first sexual encounter with [Petitioner] occurred on the floor of her parents' bedroom while she was sleeping on the floor of the room and her mother was sleeping in the bed next to her.

The trial court ruled that defense counsel could question the victim about the incident in her parents' bedroom "since that's all you've asked the Court to allow you to testify to." The trial court also ruled that, in any event, the 50 or 60 different encounters of specific events, would be confusing to the Jury, would be outside the scope of the indictment and what we're here for trial for."

*Matthew Whitehair*, 2016 WL 880021, at *16-17. In the direct appeal, Petitioner argued that the trial court improperly prevented trial counsel from "exploring" the other incidents suggested by the victim and that this ultimately prevented trial counsel from attacking the victim's credibility. Petitioner argued on appeal that Rule 412 did not apply and that the State opened the door to cross-examination. *Id.* at *17. This Court determined that even though the State opened the door as to questioning the victim about additional acts, "without an offer of proof, [Petitioner] could not demonstrate prejudice from his not being allowed to question the victim" and therefore waived the issue. *Id.*

At the post-conviction hearing, trial counsel testified that he was unable to present an offer of proof because the victim had not really given "specifics" about the additional allegations. Co-counsel agreed that the defense "didn't know enough to ask the questions" when constrained by the limits set forth in Rule 412 and that it was not worth "tak[ing] a fishing trip" in order to present an offer of proof. Appellate counsel testified that the only "way to have [gotten the proof in]" would have been to ask the victim about "the first time, the second time, . . . ."

With regard to this issue, the post-conviction court determined that Petitioner failed to show how trial counsels' failure to make an offer of proof and/or adequately preserve the record for appeal was ineffective assistance of counsel. The post-conviction court noted that trial counsel actually made two separate written offers of proof and that trial counsel and co-counsel were able to explore both of these instances of abuse not alleged in the indictment on cross-examination. Additionally, the post-conviction court noted that trial counsel and co-counsel both testified that they did not know any of the specifics of any remaining allegations. The post-conviction court concluded that trial counsel could not be found ineffective for failing to know information that was not reasonably and/or readily available.

In our review, we determine that the evidence does not preponderate against the conclusions of the post-conviction court. Trial counsel testified that he did not know any of the specifics of the additional 50 to 60 allegations and therefore would have been unsuccessful in pursuing an offer of proof. In fact, trial counsel explained that the defense theory all along was that none of the sexual abuse actually even took place so he was in a sense trying to prove a negative. Additionally, co-counsel explained that questioning the victim during an offer of proof would have been "akin to a fishing expedition." In our assessment, this was a strategic decision of trial counsel made after considering all the alternatives. Deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). The evidence at the post-conviction hearing indicates that trial counsel made adequate preparation for the case. Petitioner failed to show clear and convincing evidence at the hearing, presumably in the form of testimony or information about the additional allegations of abuse, which would have supported his argument that trial counsel and co-counsel were ineffective for failing to present the evidence in an offer of proof. Petitioner is not entitled to relief on this issue.

### C. Trial Counsel Failed to Consult and Hire an Independent Medical Expert

Petitioner insists that trial counsel was ineffective for failing to retain an independent medical expert to "rebut the testimony of the State's medical experts and their theory of the case." Specifically, Petitioner claims that trial counsels' failure to retain an expert resulted in his inability to challenge the "blatant inaccuracies" in Ms. Hampshire's testimony and present testimony that negated the State's theory of the case. The State points out that trial counsel actually consulted with "two different medical experts, subpoenaed one of them, and even had the benefit of leading [this expert] on cross-examination at trial." The State argues that the post-conviction court properly determined that Petitioner failed to establish that trial counsel was ineffective for failing to retain an additional expert.

At trial, the State utilized the testimony of Ms. Hampshire, the expert in the field of nurse practitioner, and Ms. Rosof-Williams, another expert nurse practitioner. Prior to trial, trial counsel knew that the testimony of Ms. Hampshire was a "big problem." However, trial counsel met with Ms. Rosof-Williams and ascertained "exactly what her testimony was going to be in that it was going to be there were no objective findings of sexual assault . . . whether it [occurred at the age of] 11 years old all the way up to 15 years old." Trial counsel determined that Ms. Rosof-Williams "was the most and best qualified" expert so he subpoenaed her to testify for the defense. Trial counsel explained that, in his opinion, Petitioner "had an expert" and determined that he "could accomplish everything he needed through the cross-examination of Ms. Rosof-Williams." Trial counsel also testified that he consulted with Dr. Nobles, who reviewed the report made by Ms. Rosof-Williams and agreed with her conclusions.

At the post-conviction hearing, Petitioner presented the testimony of Dr. Boles, who opined that the victim's testimony was not credible based on the findings from the medical examinations performed on the victim. Dr. Boles testified at length about the lack of damage to the victim's hymen and testified that the results of the examination were inconsistent with her allegations.

The post-conviction court determined that trial counsels' decision to refrain from hiring an independent medical expert was based on the "evaluation of multiple factors, including consultation with a medical doctor, a review of the medical records provided by the State, the report of the findings by Ms. Rosof-Williams[,] and an interview with Ms. Rosof-Williams, which led trial counsel to the conclusion her testimony would benefit [Petitioner]." The post-conviction court noted that Petitioner was acquitted on all counts involving vaginal penetration and determined that Petitioner failed to establish that trial counsel was ineffective for failing to hire an independent medical expert.

We recognize that "[i]n most cases . . . the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick v. State*, 454 S.W.3d 450, 475 (Tenn. 2015). However, we acknowledge that Petitioner's case "hinge[d] on expert forensic science testimony." *Id.*; *see also Gersten v. Senkowski*, 426 F.3d 588, 607-11 (2d Cir. 2005) (stating that defense counsel's failure "to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse" was deficient because "[t]he prosecution's entire case rested on the credibility of the alleged victim's testimony"). Recognizing the importance of the medical testimony in this case, trial counsel interviewed the State's expert, consulted with a doctor in the area of obstetrics and gynecology, and determined after talking with the doctor, that the testimony of State's own expert would support the defense theory that the victim had never had sex. Trial counsel was able to elicit on

- 26 -

cross-examination of both Ms. Hampshire and Ms. Rosof-Williams that there was no evidence of vaginal or anal trauma to the victim. The expert presented by Petitioner at the post-conviction hearing was in agreement with this assessment. Without an expert hired by the defense, the jury still acquitted Petitioner of all charges involving vaginal penetration. *Matthew Whitehair*, 2016 WL 880021, at *1. We agree with the post-conviction court that Petitioner has failed to prove trial counsel was ineffective because he failed to show prejudice as a result of trial counsels' failure to hire an independent expert. Petitioner is not entitled to relief on this issue.

### D. Trial Counsels' Failure to Interview and Call Character Witnesses

Petitioner argues that trial counsel were ineffective because they failed to interview and/or call character witnesses to testify at trial in a case where credibility of Petitioner was crucial to the defense. Petitioner insists that he was prejudiced by trial counsels' failure because had the "jury heard from compelling, persuasive character witnesses" the verdict of the jury would "likely" have been different. The State insists that the post-conviction court properly determined that the decision was "strategic."

During the hearing on the petition, Mr. Gibson and Mr. Nelson testified about Petitioner's character and that they knew Petitioner to have a reputation for truthfulness. Petitioner admitted that he did not tell trial counsel about either of these potential witnesses prior to trial. Mr. Evans, the attorney who testified as the standard of care and prevailing norms for in a criminal case, testified that reasonable minds can differ as to the effectiveness and/or necessity of calling character witnesses in a criminal trial. Mr. Evans also explained that there are certainly circumstances where it would be acceptable to decide not to call character witnesses. Trial counsel testified that he interviewed "15 or 20" witnesses that could have testified at trial. However, trial counsel explained that he "knew" the family and knew that there was potential for "very, very harmful" testimony to come out against Petitioner, specifically with regard to a suicide attempt that trial counsel successfully suppressed prior to trial. Trial counsel explained that the defense was more focused on attacking the credibility of the victim.

The post-conviction court determined that it was a "tactical decision" that trial counsel made and Petitioner failed to establish trial counsels' failure to call character witnesses was deficient performance. We agree. The evidence presented at the hearing indicated that trial counsel made the decision to forego character witnesses based on trial strategy after assessing the positives and negatives. We will not second-guess this strategy on appeal. *Adkins*, 911 S.W.2d at 347; *Williams*, 599 S.W.2d at 279-80. Petitioner is not entitled to relief on this issue.

### E. Trial Counsels' Failure to Call Ms. Parks as a Recantation Witness

Petitioner argues that trial counsel was ineffective for failing to call Ms. Parks to testify at trial. Specifically, Petitioner argues that the post-conviction court improperly determined that the decision was strategic where the testimony from Ms. Parks would have been both admissible and material to the defense. Further, Petitioner insists that he was prejudiced by trial counsel's failure to call the witness because there was a reasonable probability that her testimony would have led to an acquittal or conviction on a lesser-included offense. The State disagrees.

At the hearing on the petition, Ms. Parks testified that she would have testified at trial about several instances during which the victim told her that she had never had sex. Trial counsel recalled Ms. Parks's proposed testimony and remembered that he considered calling her as a witness at trial. Trial counsel explained that as the trial was "finishing up," he and co-counsel were "trying to decide whether to call another witness" but decided that "calling another witness like Ms. Parks would just open up [the State's] opportunity to hit [Ms. Parks] with a lot of that cross[-] examination of, here, here is how the family has been treating this daughter." Trial counsel also explained that he had elicited the testimony that Ms. Parks would have provided, i.e., that the victim had never had sex, through the testimony of the victim's pediatrician. Trial counsel explained, "the benefit of calling her did not outweigh the possible detriment . . . . But as [co-counsel, Petitioner, trial counsel, and Petitioner's wife] did on every big decision in this case, we put our heads together, and we tried to make a decision."

The post-conviction court determined Petitioner "has failed to show trial counsel was deficient by failing to call Ms. Parks." The decision was "a considered tactical decision" made by trial counsel and deemed "reasonable" by the post-conviction court. Consequently, the post-conviction court determined that Petitioner failed to prove that trial counsels' decision was "so deficient as to render him ineffective." We agree. We will not second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins*, 911 S.W.2d at 347; *Williams*, 599 S.W.2d at 279-80. Clearly, it was a strategic decision not to call Ms. Parks as a witness because trial counsel felt like the trial was "going well" and did not want to open the door for the State to question Ms. Parks about other matters.

Moreover, Petitioner cannot show prejudice. Ms. Parks claimed that the victim denied having sex. At trial, the jury acquitted Petitioner of all of the charges involving vaginal penetration. *Whitehair*, 2016 WL 880021, at *1. Accordingly, the addition of Ms. Parks's testimony would not have changed the outcome of trial. Petitioner is not entitled to relief on this issue.

*F. Trial Counsels' Failure to Object to the Testimony of Kevin Smith*

Petitioner argues that trial counsel were ineffective for failing to object to the "conclusory and prejudicial statements" made by Mr. Smith at trial. Specifically, Petitioner argues that Mr. Smith's testimony was objectionable because it "bolstered the credibility of [the victim] and diminished the credibility of Petitioner" and that he was prejudiced because "the jury was more likely to ratify the charges . . . knowing that 30 to 50 other people in the business of protecting children unanimously found the investigation credible." Petitioner insists that "there is at least a reasonable probability that had [trial counsel] objected, the trial court would have . . . issue[ed] a cautionary instruction and might have granted a mistrial." The State argues that the post-conviction court properly denied relief when it determined that trial counsels' decision was tactical.

At trial, Mr. Smith testified as to the protocol followed by the Department of Children's Services in cases involving allegations of child rape. During his testimony, he explained that during an investigation, the evidence collected was presented to a team of thirty to fifty individuals for review. Mr. Smith explained that in the victim's case, the team's assessment of the investigation was unanimous. Trial counsel did not object to this statement.

At the hearing on the post-conviction petition, trial counsel testified that he objected "very often" during Mr. Smith's testimony but that there was a "balance" that had to be maintained when objecting to make sure that the defense was not "suggesting . . . to the jury that you're hiding something or that you're scared of evidence . . . ." Thus, he did not object to the statement made about the unanimous nature of the vote on the investigation.

The post-conviction court determined that Petitioner failed to show that trial counsels' failure to object was deficient. The post-conviction court noted trial counsel's "numerous" objections during Mr. Smith's testimony and explained that "weighing the decision of when to object and when not to object is a tactical decision." Our review of the trial transcript reveals that during Mr. Smith's testimony at trial, prior to the statement about which Petitioner complains herein, trial counsel had objected at least 29 times. Mr. Smith's direct testimony lasted only approximately 40 minutes. Trial counsel explained that there is a "balance" between objecting too many times and not objecting enough during a witness's testimony. "There is no obligation on a lawyer to object at every opportunity." *State v. Donald Craig*, No. 85-10-III, 1985 WL 3866, at *3 (Tenn. Crim. App. Nov. 27, 1985), *perm. app. denied* (Tenn. Mar. 3, 1986). The decision about whether to object is a strategic and tactical decision. *See William Lance Walker v. State*, No. M2014-01305-CCA-R3-PC, 2014 WL 7177961, at *7 (Tenn. Crim. App. Dec. 17, 2014) (determining it was a reasonable trial strategy to refrain from objecting in part to

- 29 -

"limit the jury's irritation"), *no perm. app. filed*.  We will not second-guess a reasonable trial strategy on appeal.  Petitioner is not entitled to relief.

### G. Trial Counsels' Failure to Object to Prosecutorial Misconduct

Petitioner complains that trial counsel failed to object to "pervasive prosecutorial misconduct."  Specifically, Petitioner points to eleven different instances of alleged misconduct, each of which "stands on its own, but when viewed in totally, the prosecutorial misconduct in this case is profound and egregious."  Petitioner also complains that trial counsel failed to ask for a mistrial.  The State insists that the post-conviction court properly determined that trial counsel made "strategic" decisions about whether to object to the prosecutor's statements "based on an analysis of how [they] thought the trial was progressing."

Petitioner lists the following instances of alleged prosecutorial misconduct:

(1) during voir dire, manufacturing sympathy for the alleged victim for having to testify,
(2) in opening statement, vouching for the credibility of the alleged victim and arguing Petitioner used the 'adoption paper like a marriage certificate;'
(3) eliciting improper testimony from State witnesses such as:
> (a) Detective Lawson (opining to the 'unusual' nature of Petitioner's response to being questioned);
> (b) Sara Hampshire (regarding dissociation);
> (c) [the victim] (cuing her by improperly speaking in the presence of the jury and repeatedly inserting issues of abandonment (by her mother), duress and coercion (by defense counsel cross-examining her)); and,
> (d) Detective Roberts (eliciting sympathy for the alleged victim, vouching for the credibility of the alleged victim and Adam McGreavy, and twice referring to Petitioner as the 'perpetrator');
(4) by ignoring Court rulings throughout the trial; and,
(5) in closing and rebuttal argument, by:
> (a) arguing outside the record,
> (b) repeated burden shifting to Petitioner and commenting on Petitioner's right to remain silent and not incriminate himself by highlighting the defense's failure to prove certain things or advance certain evidence (such as not introducing phone records, failure to disclosure of Hampshire's exam, and not

volunteering for a DNA test and requiring the State get a subpoena);
(c) vouching for the credibility of the alleged victim, and,
(d) commenting on his right to counsel.

At the post-conviction hearing, Mr. Evans and appellate counsel testified that there were numerous instances of prosecutorial misconduct at trial and that trial counsel failed to object to every instance, failed to utilize the label "prosecutorial misconduct" for the statements of the prosecutor, and failed to request curative measures from the trial court. Trial counsel testified that he was aware that the prosecutor had a "special personality" that was "sometimes not well received." Trial counsel saw some of the jurors "cutting eyes" during some of the prosecutor's statements. Trial counsel recalled that at the beginning of the trial, he objected "often." As the trial progressed, the determination about whether to object became more strategic. Co-counsel agreed that the defense team made a "considered decision" to refrain from objecting. He explained he and trial counsel decided to "just let [the prosecutor] go" because she was "helping the [Petitioner's] case." The post-conviction court determined that Petitioner "failed to show that the failure of trial counsel to object to each of these alleged incidents deprived [Petitioner] of the effective assistance of counsel." Additionally, the post-conviction court did not recall any statements of the prosecutor that would rise "to the level of requiring a mistrial" and determined that Petitioner failed to admit proof at the hearing that "but for the lack of an objection at any point during the trial, the [trial court] would have declared a mistrial or that the lack of such an objection changed the outcome of the trial."

Here, Petitioner makes several generalized complaints about instances of prosecutorial misconduct without identifying specific passages or statements made by the prosecutor that he finds objectionable. When considering prosecutorial misconduct as a basis for ineffective assistance, a Petitioner must first demonstrate that prosecutorial misconduct occurred. *Michael Lee McCormick v. State*, No. 03C01-9802-CR-00052, 1999 WL 394935, at *18 (Tenn. Crim. App. June 17, 1999) (citing *State v. Pulliam*, 950 S.W. 2d 360, 367 (Tenn. Crim. App. 1996)). If a post-conviction court determines that prosecutorial misconduct occurred at trial, the reviewing court must then determine whether the failure to object to the conduct deprived the defendant of effective assistance of counsel. *McCormick*, 1999 WL 394935, at *18 (citing *Coker v. State*, 911 S.W.2d 357, 371 (Tenn. Crim. App. 1995), *superseded on other grounds by rule*, Tenn. Sup. Ct. R. 28, § 3(B) as recognized in *State v. West*, 19 S.W.3d 753 (Tenn. 2000)). Absent testimony from trial counsel or evidence indicating that trial counsels' decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan.12, 2007), *perm. app. denied* (Tenn. May 14, 2007).

Here, trial counsel testified that they strategically chose when to object to statements made by the prosecutor. The post-conviction court found that trial counsel raised "multiple objections" during the lengthy trial and testified at the hearing that "they objected where they felt it was appropriate, and at times, made a strategic decision not to object." It is clear the post-conviction court determined that Petitioner failed to show that had trial counsel objected, the outcome of the trial would have been different. We agree.

Moreover, post-conviction relief is not available for issues that have been previously determined. T.C.A. § 40-30-106(f)(h); *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). On direct appeal, Petitioner argued that "he [wa]s entitled to a new trial based upon repeated and deliberate prosecutorial misconduct committed during the presentation of proof and closing arguments." *Matthew Whitehair*, 2016 WL 8800021, at *20. While on direct appeal, Petitioner's complaint was seemingly centered on allegedly improper testimony and statements about the victim's family history during argument, this Court determined that the primary defense was that the victim was lying and defense counsel appropriately attacked the victim's credibility during cross-examination. The State attempted to rehabilitate the victim by showing she "remained steadfast in her allegations despite the loss of her family and the disruption to her life." This Court determined in the direct appeal that Petitioner failed to show that he was prejudiced by these allegedly improper statements.

## II. Ineffective Assistance of Appellate Counsel

Petitioner argues that appellate counsel was ineffective on direct appeal for failing to raise prosecutorial misconduct on appeal. Additionally, Petitioner argues that appellate counsel was ineffective for failing to appeal the "improper and prejudicial" statements made during the testimony of Mr. Smith.

With regard to the allegation that appellate counsel was ineffective for failing to raise prosecutorial misconduct on appeal, we reiterate that appellate counsel raised this issue on appeal. *Id.* Appellate counsel acknowledged at the hearing that his ability to raise some issues on appeal was limited due to trial counsel's failure to adequately create a record, whether through failure to object or otherwise, and that a portion of the issues presented on appeal would only be successful if he could show plain error. Despite this heavy burden, appellate counsel raised the prosecutorial misconduct issue on appeal. This Court determined on direct appeal that Petitioner was not entitled to relief. Again, post-conviction relief is not available for issues that have been previously determined. T.C.A. § 40-30-106(f)(h); *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999).

With respect to the claim that appellate counsel failed to raise issues about Mr. Smith's testimony on appeal, the post-conviction court determined that Petitioner was not entitled to relief because he failed to "put on any proof in support of the alleged failure by appellate counsel . . . [o]ther that the general assertion that trial counsel's failure to adequately create a record." Appellate counsel testified at the hearing that he made the strategic decision to forego this issue on appeal because it would have only been considered by the appellate court if it rose "to the level of what they call plain error" and he "did not have all the criteria for plain error to exist." We agree with the post-conviction court that Petitioner failed to prove his allegation by clear and convincing evidence. Petitioner is not entitled to relief.

*Cumulative Error*

Finally, Petitioner argues that he is entitled to relief under the cumulative error doctrine. When "multiple errors [are] committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial," a defendant can be entitled to relief. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Here, there can be no cumulative prejudicial effect where we have not found any error. Petitioner is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE